## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:

MONTANA VILLAGE DEVELOPERS, LLC,

Debtor.

Bankr. Case No. 25-16406-JGR
Chapter 11

## OPINION AND ORDER

THIS MATTER comes before the Court on (1) the Debtor's Disclosure Statement to Accompany Amended Plan of Reorganization filed March 11, 2026 (Doc. 134) and the Objection thereto filed by Indicate Capital REIT, LLC ("Indicate") on March 27, 2026 (Doc. 143), and (2) Indicate's Motion for Relief from the Automatic Stay filed on January 21, 2026 (Doc. 100) and Amended Motion for Relief from the Automatic Stay filed on January 23, 2026 (Doc. 107), and Objections thereto filed on February 11, 2026 by Debtor (Doc. 117) and Re III Debt I, LLC ("Re III") (Doc. 118).

The Court conducted an evidentiary hearing on April 1, 2026. After considering the evidence, witness testimony, arguments of counsel, and applicable law, the Court finds and concludes as follows.

### I.    JURISDICTION

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334.  These are core proceedings under 28 U.S.C. § 157(b)(2)(G), (L), and (O).  Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

### II.    BACKGROUND

Montana Village Developers, LLC ("Debtor"), a Colorado limited liability company, filed this Chapter 11 case on October 1, 2025.  In the petition, the Debtor identified itself as a single asset real estate debtor (Doc. 01).  The Debtor's principal asset is a nineteen-unit townhome development located at 2650 South Delaware Street, Denver, Colorado (the "Property") (Doc. 140).

The Property consists of completed townhomes.  The Debtor contends that delays in obtaining utility service from Xcel Energy prevented the Debtor from selling the townhomes earlier and contributed to the default and foreclosure proceedings that preceded this case.  Nathan Adams, the Debtor's manager, testified that the Debtor applied for permanent power in January 2022 but did not receive approval until late February 2025.  By the time the Property received power, Indicate had placed the Property in foreclosure.

Indicate holds a first-priority deed of trust against the Property for a loan made in the principal amount of $8,575,000 (Exs. 2, 3).  Cole Newcomer, Indicate's senior asset manager, testified that the note bears interest at the non-default rate of 12% and default interest at 24% (Ex. 3).  The note matured on April 1, 2024.  The Debtor did not pay the note at maturity.  Indicate commenced foreclosure proceedings before the bankruptcy filing.  The Debtor filed this case one day before a scheduled foreclosure sale (Doc. 140).

Indicate filed a proof of claim asserting a secured claim in the amount of $10,446,576.63 as of the petition date (Ex. 4).  Mr. Newcomer testified that the payoff amount as of April 1, 2026 was $11,487,423.50 (Ex. 12).  The Debtor disputes the amount required to satisfy Indicate's claim and asserts that the principal amount of the note was modified by the parties and reduced to $8.7 million based on certain September 2025 communications between the parties (Ex. 19).

Re III holds a junior secured claim in the Property.  The Plan treats Re III as the holder of a secured claim in the principal amount of $2,810,000 plus interest (Doc. 132).  The record also reflects additional secured claims against the Property, including mechanic's lien claims for Altura Land Consultants, LLC in the amount of $5,140 and Sonepar Mountain Holdings, LLC in the amount of $13,722.14.  Two creditors purchased prior tax liens: Tower DB XIII Trust 2023-1 in the amount of $40,386.06 and Mercury Funding, LLC in the amount of $42,988.  And, the City and County of Denver holds a tax lien in the amount of $11,938.62 (Doc. 117).

On December 12, 2025, Debtor filed a Chapter 11 Plan of Reorganization and Disclosure Statement (Docs. 87, 88).  Debtor's first Disclosure Statement drew objections from the United States Trustee (Doc. 96), Re III (Doc. 103), and Indicate (Doc. 105).

On January 21, 2026, Indicate filed a Motion for Relief from Stay on the Property (Doc. 100), and on January 23, 2026, Indicate filed an Amended Motion for Relief from Stay (Doc. 107).  On February 11, 2026, Debtor and Re III filed Objections thereto (Docs. 117 and 118, respectively).

Debtor filed its Amended Plan of Reorganization and Amended Disclosure Statement on March 11, 2026 (Docs. 132, 134), a Supplement to the Amended Disclosure Statement on March 24, 2026 (Doc. 137), and a Corrected Supplement to the Amended Disclosure Statement on March 30, 2026 (Doc. 144).  On March 27, 2026, Indicate filed its Objection thereto (Doc. 143).

## III.    FINDINGS OF FACT

The Court conducted an evidentiary hearing on April 1, 2026 (Docs. 145, 146). The following witnesses testified: Cole Newcomer, Nathan Adams, and Paul Ko.  The Court adopted the stipulated facts set forth in the Joint Pretrial Statement (Doc. 140) and admitted the exhibits identified below (Docs. 145, 146).

The Court has considered the pleadings filed in the bankruptcy case, the testimony of the witnesses, the stipulated facts, and the admitted exhibits.

2

### a. Admitted Exhibits

Debtor's Exhibits A through K include:

A. Debtor's Chapter 11 Voluntary Petition and Schedules.

B. Amended Schedule E/F (Doc. 27).

C. Amended Schedule A/B and E/F (Doc. 69).

D. Amended Schedule E/F (Doc. 75).

E. Amended Redline Plan.

F. Appraisal.

G. Payoff from Indicate Capital.

H. Amended Plan of Reorganization.

I. Disclosure Statement to Accompany Amended Plan of Reorganization.

J. Supplement to Disclosure Statement to Accompany Amended Plan of Reorganization.

K. Redline Amended Plan of Reorganization.

Movant's Exhibits 1 through 15, 17, and 19 through 22,[1] include:

1. Construction Loan and Security Agreement dated December 29, 2022.

2. Deed of Trust dated December 29, 2022.

3. Secured Note dated December 29, 2022, in the principal amount of $8,575,000.

4. Indicate Capital REIT, LLC's Proof of Claim.

5. Borrower's Statement of Account for Montana Village Developers, LLC.

6. Disclosure Statement dated March 11, 2026, filed by Montana Village Developers, LLC.

7. Amended Plan of Reorganization dated March 11, 2026, filed by Montana Village Developers, LLC.

---

[1] Movant's Exhibits 16, 18, 23, 24 were not offered (Docs. 145, 146).

8. Monthly Operating Report for December 31, 2025, filed by Montana Village Developers, LLC.

9. List of 20 Largest Unsecured Claims.

10. Motion to Modify and Continue Use of Cash Collateral.

11. Profit and Loss Statement for October 2025 through February 2026.

12. Beneficiary's Demand for Payment as of April 1, 2026.

13. Lease Agreement for 2660 #7.

14. Memorandum of Understanding for 2660 #7.

15. Warranty Deed from R&D Companies Inc. to Montana Village LLC.

17. Warranty Deed from Montana Village LLC to Montana Village Developers, LLC.

19. Email chain between Cole Newcomer and Paul Ko dated September 3, 2025.

20. MLS Listing for 2620 South Delaware Street, Unit #3, dated March 13, 2024.

21. MLS Listing for 2620 South Delaware Street, Unit #3, dated March 25, 2025.

22. MLS Listing for 2620 South Delaware Street, Unit #2, dated July 11, 2025.

### b.  Stipulated Facts

The Court adopts the stipulated facts set forth in the Joint Pretrial Statement (Doc. 140).  Those facts are as follows:

1. The Debtor is a townhome development project consisting of nineteen townhomes in Denver, Colorado. Construction was substantially completed in November 2024.

2. The Debtor obtained a construction loan from Indicate in the amount of $8,575,000, which was secured by a deed of trust encumbering the Property.

3. Indicate commenced foreclosure proceedings on March 18, 2025.

4. The Debtor sought protection under Chapter 11 of the Bankruptcy Code, filing its voluntary petition on October 1, 2025 as a single asset real estate case.

5. The bankruptcy was filed one day before a scheduled foreclosure sale.

6. Indicate filed a proof of claim in the amount of $10,446,577.

4

7.  The Debtor is currently leasing fourteen townhomes.  Each townhome leases for between $2,400 and $2,800.  The Debtor is receiving approximately $35,000 per month in rent on account of the fourteen townhomes.

8.  In February 2025, the Debtor obtained a property appraisal stating a valuation of $12,850,000.  It values the nineteen townhomes as follows:

**Unit 1:** $700,000    **Unit 2:** $685,000    **Unit 3:** $685,000    **Unit 4:** $685,000

**Unit 5:** $685,000    **Unit 6:** $685,000    **Unit 7:** $685,000    **Unit 8:** $685,000

**Unit 9:** $685,000    **Unit 10:** $700,000   **Unit 11:** $685,000   **Unit 12:** $660,000

**Unit 13:** $660,000   **Unit 14:** $660,000   **Unit 15:** $660,000   **Unit 16:** $660,000

**Unit 17:** $660,000   **Unit 18:** $660,000   **Unit 19:** $675,000

9.  The Debtor has not made any post-petition payments to Indicate.

### c.  Debtor's Postpetition Operations

In addition to the stipulated facts regarding the Debtor's leases and rental income, Mr. Adams testified that the Debtor had since signed leases for all nineteen units, although all tenants had not yet moved in as of the hearing.  He testified that rents generally range from approximately $2,400 to $2,800 per unit and that most leases are for twelve months.  The admitted lease exhibit is consistent with the Debtor's use of the Property for residential leasing (Ex. 13).

The Debtor's leasing efforts have generated income and preserved some value in the Property.  The Court credits Mr. Adams's testimony that the Debtor made operational progress by pivoting to leases after utility service was obtained.  That progress, however, does not establish that the Plan can be confirmed within a reasonable time.

The Debtor's filed monthly operating reports ("MORs") show the following cash receipts, disbursements, ending cash balances, and profit/loss:

| Reporting Period | Total Receipts | Total Disbursements | Ending Cash | Reported Profit / Loss |
|---|---|---|---|---|
| October 2025 | $3,561 | $5,143 | ($1,581) | ($1,583) |
| November 2025 | $9,221 | $15,661 | ($8,021) | ($6,430) |
| December 2025 | $18,376 | $12,704 | ($2,351) | $5,672 |
| January 2026 | $24,467 | $20,892 | $1,223 | $3,574 |
| February 2026 | $26,349 | $19,761 | $7,811 | not reported |

| Reporting Period | Total Receipts | Total Disbursements | Ending Cash | Reported Profit / Loss |
|---|---|---|---|---|
| **March 2026** | $28,894 | $22,146 | $14,559 | $7,748 |
| **April 2026** | $31,408 | $3,437 | $35,433 | $15,493 |
| **May 2026** | $39,741 | $17,452 | $57,722 | $23,204 |

The Debtor's MORs reflect improvement in rental receipts during the case (Docs. 86, 90, 99, 116, 131, 135, 149, 150, 151, 152).   The MORs also show that the Debtor's net income from rental operations remains small in relation to the secured debt.  The reports include no interest expense or debt service payments to Indicate.  Thus, the positive monthly cash flow shown in some reports does not reflect amortization of Indicate's secured claim, any payment sufficient to reduce the principal balance of that claim, or any meaningful payment to Re III.

The MORs corroborate that the Debtor made progress in leasing and operating the Property, but they do not establish that the Debtor can perform under the Plan.  The reported rental income remains far below the amount required to pay current interest on Indicate's claim, amortize principal, satisfy the Indicate claim within the proposed Plan period, or pay junior secured creditors.  Even the May 2026 MOR, which reports the highest monthly receipts in the record at $39,741, does not show enough income to pay current interest on Indicate's claim at the non-default rate, amortize principal, satisfy Indicate within the proposed Plan period, or pay junior secured creditors (Doc. 152).

The Court also notes that the MORs for March, April, and May 2026 were filed after the April 1, 2026 evidentiary hearing (Docs. 150, 151, 152).  To the extent the Court considers those filings as part of its docket, they do not alter the Court's analysis.  The MORs show continued improvement in receipts; but still do not show an ability to satisfy Indicate's secured claim from operations or perform the Plan without refinancing or sales.

### d. Indicate Claim and Payment History

Mr. Newcomer testified that the last interest payment on the loan was made from an interest reserve on November 1, 2024.  After the interest reserve was exhausted, Indicate received only one payment from the Debtor, in the amount of $25,000, dated September 2, 2025.  Other than that $25,000 payment, Mr. Newcomer testified that the Debtor made no payments to Indicate after November 1, 2024.  The statement of account reflects the loan history and payment activity (Ex. 5).

The Debtor has not commenced monthly payments to Indicate under § 362(d)(3)(B).  The Debtor acknowledged in its objection that § 362(d)(3)(B) does not apply because the Debtor has not commenced monthly payments to Indicate (Doc. 117).  Accordingly, the Court must evaluate whether the Debtor has satisfied § 362(d)(3)(A).

### e.  September 2025 Payoff Communications

The parties dispute the significance of September 2025 communications concerning an $8.7 million payoff negotiation (Ex. 19).  The Debtor contends the communications support its proposed plan treatment of Indicate's secured claim at $8.7 million.  Indicate contends the $8.7 million figure was part of conditional workout negotiations that were never completed.

The Court finds, for purposes of these contested matters, that the $8.7 million payoff figure was conditional and that the Debtor did not satisfy the predicate conditions. Mr. Newcomer testified that the September 2025 email chain reflected proposed workout terms after months of discussions.  He testified that $25,000 payments every ten days were required to preserve the $8.7 million figure, that refinancing had to be completed, and that Debtor was to grant Indicate a second-position deed of trust for $325,000.  He further testified that Debtor did not make the required recurring $25,000 payments, did not complete the refinancing, and did not grant the second deed of trust.  The email chain between Mr. Newcomer and Paul Ko, dated September 3 and 4, 2025, is consistent with Indicate's position that the $8.7 million payoff figure was conditioned on continuing payments and full payoff (Ex. 19).

The Court questioned Mr. Newcomer concerning the September 2025 email.  Mr. Newcomer confirmed that the Debtor was required to make $25,000 payments every ten days until the $8.7 million payoff was paid, that the Debtor made one $25,000 payment, that no further $25,000 payments were made, and that the $8.7 million payoff was never paid (Exs. 5, 19).

Paul Ko testified that Indicate later requested a higher payment shortly before the bankruptcy filing and that the Debtor viewed the shifting terms as a reason it had to file bankruptcy.  Mr. Newcomer testified that in the ongoing negotiations, Indicate later returned to the $25,000 payment amount in discussions before the foreclosure sale.  The Court need not resolve every factual detail of those late-stage communications.  Even crediting the Debtor's evidence that the required interim payment amount became a disputed issue shortly before the petition date, the record does not establish a completed or enforceable payoff agreement that satisfied Indicate or funded the Plan.

The Court does not make a final claim-allowance determination in this ruling.  The Court finds only that, for purposes of the stay-relief analysis, the $8.7 million payoff communications do not establish that an enforceable agreement was reached regarding the discounted payoff.

### f.  Proposed Plan

The Plan places Indicate in Class 3.  It provides that Indicate will be paid from Net Rent Proceeds, Net Refinance Proceeds, and Sale Proceeds.  The Plan further provides that Indicate's Class 3 claim must be paid in full within eighteen months after the Effective Date or Indicate may exercise its state law rights and remedies (Doc. 132).

The Plan places Re III in Class 4.  The Plan treats Re III's secured claim in the principal amount of $2,810,000 plus interest.  The Plan contemplates payment of Re III and other secured creditors from Sale Proceeds or Net Refinance Proceeds, in the same order of priority that existed prior to the bankruptcy filing, and to the extent such proceeds exist (Doc. 132).

The Plan contemplates funding from three sources: rental income, refinancing, and future sales.  The evidence presented at the hearing does not show that those funding sources are reliable or sufficient, either individually or collectively, to provide a reasonable possibility of confirmation within a reasonable time.

### i.  Rental Income

The Debtor filed a Supplement to the Disclosure Statement containing projected operating results at three occupancy levels.  With 13 rented units, the Debtor projected monthly net income of $13,847.48.  With 17 rented units, the Debtor projected monthly net income of $20,697.48.  With all 19 units rented, the Debtor projected monthly net income of $27,647.48 (Doc. 144; Ex. J).

The projections show that the Debtor can generate some net operating income from the Property.  They do not, however, show an ability to satisfy  the  treatment of secured creditors proposed in the Plan.

Mr. Newcomer testified that, even if all nineteen units were leased, all concessions had expired, and tenants paid for utilities, there would not be sufficient cash flow to service the loan at the non-default interest rate, much less the default rate.  The Court finds that testimony persuasive.  At full occupancy, the Debtor's own projections show net income of $27,647.48 per month.  That amount is not sufficient to pay current interest on Indicate's claim, materially reduce principal, pay Indicate in full within eighteen months after the Effective Date, or provide meaningful payment toward Re III's junior secured claim (Doc. 144; Ex. J).

The treatment for Indicate's secured claim in the Debtor's Plan provides for the restructuring of the promissory note that matured on April 1, 2024.  The Plan allows the claim in the principal amount of $8,700,000 with accrued interest at the non-default rate of 12% or such other amount as agreed to by the parties or adjudicated by the Court.  Indicate shall receive net rent proceeds and/or net refinance proceeds and/or sales proceeds until paid in full.

Based on the MORs filed in the case, the revenues generated by the Debtor are insufficient to satisfy Indicate's claim.  Debtor's projected monthly net income at full occupancy is $27,647.48.  By comparison, interest at 12% on Debtor's proposed allowed principal amount of $8,700,000 results in a monthly interest payment of $87,000; interest at 12% on Indicate's $10,446,576.63 proof of claim requires a monthly interest payment of  $104,456.77; and interest at 12% on Indicate's $11,487,423.50 April 1, 2026 payoff

demand requires a monthly interest payment of $114,874.24[2].  The Plan further provides that if Indicate is not paid in full within 18 months, it may exercise its state-court remedies.

This comparison does not include default interest, principal amortization, payments to Re III, payments to other secured creditors, operating reserves, sale costs, or administrative expenses.  The projected rental income is therefore insufficient even under assumptions favorable to the Debtor.

Under the Plan, to the extent that rental income is insufficient to meet the monthly interest payment, unpaid interest accrues and would be satisfied through the refinance of the Property or through the proceeds of the sales of individual units.  Paragraph 9.12 of the Plan provides that "[t]he sale process will start not later than January of 2027."  The Plan provides for a thirty-six-month term to pay off junior secured claims and states that the sale process will be completed within 5 years.

The MORs show postpetition rental receipts and, in some months, positive cash flow (Docs. 131, 149, 150).  But because those reports do not include interest payments to Indicate or any amortization of Indicate's secured claim, they do not show plan-level feasibility.

Mr. Newcomer also testified that the Debtor's profit-and-loss statement for October 2025 through February 2026 showed net income of $7,810.89 for that period (Ex. 11).  That amount is not sufficient to support the Plan's proposed treatment of Indicate or junior secured creditors.

### ii.  Refinancing

The Debtor contends that it has pursued refinancing and that refinancing will provide the principal source of payment to Indicate.  The record does not include a binding loan commitment, executed refinancing agreement, or other enforceable financing document establishing that refinancing will close on terms sufficient to pay Indicate within the Plan period.

The testimony concerning refinancing confirms the uncertainty.  Mr. Newcomer testified that Indicate worked with the Debtor's proposed financing source or broker over a period of months.  The parties explored institutional refinancing, bridge financing, debt-service-coverage-ratio financing, and hybrid structures.  No refinance closed.  The September 2025 email chain corroborates that the parties were attempting to structure a workout and payoff arrangement before the petition date (Ex. 19).

The Court does not rely on Mr. Newcomer's opinion as expert valuation or lending-market testimony.  The Court does consider his testimony as evidence of Indicate's actual experience with this Debtor's refinancing efforts before bankruptcy.  That experience is

---

[2] The Court notes that this comparison uses the 12% non-default rate in the note only as an analytical reference point.  It does not decide Indicate's allowed secured claim, entitlement to default interest, or final payoff amount.

relevant. It shows that refinancing was actively pursued for months and did not close, even as Indicate reduced the payoff amount it was willing to accept during workout discussions.

The Debtor's evidence shows earnest efforts to obtain financing. However, it does not show that financing is available on terms sufficient to perform the Plan. In fact, the Debtor has had an additional four months from the date of the evidentiary hearing to secure refinancing. A plan may depend on refinancing if the evidence shows a reasonable assurance that refinancing will occur. Without a binding commitment or specific financing terms, refinancing remains a hoped-for source of payment rather than objective evidence of a workable plan. The evidence presented here does not provide the reasonable assurance necessary to support confirmation under § 1129(a)(11).

### iii. Future Sales

As an alternative to refinancing, the Plan provides for the future sales of townhomes. The Debtor presented valuation evidence and evidence concerning marketability (Ex. F; Exs. 20, 21, 22). The appraisals support the Debtor's contention that the units have substantial value. But value is not the same as monetization. The appraisals do not constitute purchase contracts, committed buyers, a sale schedule, financing commitments, or evidence of net sale proceeds available within the Plan's eighteen-month period to satisfy Indicate's secured claim in full. They also do not establish that the Debtor will sell enough units quickly enough and generate sufficient net proceeds to satisfy the Indicate claim and also perform the Plan's treatment of junior secured creditors.

For purposes of this ruling, the Court assumes that the appraisals support substantial value in the townhomes. The dispositive problem is not that the Property lacks asserted value. The dispositive problem is that the Debtor did not prove a reliable mechanism to convert that asserted value into payments required by the Plan within a reasonable time.

Mr. Adams testified that the first lease will vacate in August, that the Debtor expects to be selling homes by then, and that the Debtor expects to be selling homes by January 2027. The Court credits that Mr. Adams intends to resume sales and believes sales will occur. The Court does not find that testimony sufficient to establish a reasonable possibility of confirmation within a reasonable time.

The record contains contrary market evidence. Mr. Newcomer testified as a fact witness about the adjacent project located at 2620 South Delaware Street. With respect to that project, Mr. Newcomer identified three MLS listings. One unit was listed in March 2024 for $650,000 and remained on the market for 139 days with no activity (Ex. 20). Another was listed in March 2025 for $596,000 and remained on the market for 108 days with limited showings and no offers (Ex. 21). A third was listed in July 2025 for $585,900 and also had limited activity and no sale (Ex. 22). Mr. Newcomer testified that these listings reflected a lack of buyer demand for similar townhomes in the immediate vicinity of the Debtor's Property.

Mr. Newcomer also testified about a second townhome project located in a different part of the greater Denver metropolitan area in which he had invested. He testified that, like the adjacent property, he believed this second townhome project was comparable to the Property. He testified that despite best efforts to market those units, sales had been slow or nonexistent. He further testified that, across both of the projects he considered comparable, none of the approximately thirty similar townhomes had sold.

The Debtor cross-examined Mr. Newcomer concerning differences between the Debtor's Property and the second townhome project. The cross-examination was effective and established meaningful differences in location, design, and market characteristics. The Court therefore gives limited weight to Mr. Newcomer's testimony about that other project as a direct valuation comparable. The Court gives greater weight to the evidence concerning the adjacent 2620 South Delaware project and the absence of actual sales for those units, as well as the lack of binding sale contracts for the Debtor's units.

The existing leases also affect the timing and practical ability to sell units. Most leases are twelve-month leases. The Debtor's sale strategy depends on leases expiring, market demand improving, units being listed, and buyers purchasing at prices sufficient to generate net sale proceeds. On this record, future sales remain a possible source of payment, but the Debtor has not shown they provide a reasonable possibility of confirmation within a reasonable time. The Plan would instead require Indicate to bear the continued accrual of its claim and the risk of market deterioration while the Debtor waits for market conditions to improve.

### g.  Debtor's Intent to Pay Creditors and Credibility Findings

Mr. Adams testified that his goal is to pay all creditors in full, including Indicate, Re III/Bow River, and mechanic's lien claimants. The Court credits Mr. Adams's testimony that he wants to pay creditors and that he believes a sale process may do so. Mr. Adams has substantial experience in real estate and townhome development, including testimony that he has developed more than 1,000 units.

The Court also credits Mr. Newcomer's testimony regarding Indicate's loan history, the Debtor's payment history, the failed workout discussions, and the parties' prepetition refinancing efforts. Those matters were supported by admitted documents, including the note, the statement of account, the proof of claim, the payoff demand, and the September 2025 email chain (Exs. 3, 4, 5, 12, 19).

The Court does not find that Mr. Adams lacked candor or that the Debtor acted in bad faith. But the feasibility inquiry requires objective evidence of a workable plan. The Debtor's intent and Mr. Adams's experience are relevant, but they do not substitute for committed refinancing, binding sale contracts, or cash flow sufficient to perform under the Plan.

11

## IV.   APPLICABLE LAW

### a.  Contract Principles

Under Colorado law, an agreement unsupported by consideration is invalid and unenforceable.  *City of Arvada v. Concrete Contractors, Inc.*, 628 P.2d 170, 172 (Colo. App. 1981).  Even where a contract was valid when formed, one party's material and unexcused failure to perform the bargained-for exchange may relieve the other party of its corresponding duty of performance.  *Converse v. Zinke*, 635 P.2d 882, 887 (Colo. 1981).

### b.  Disclosure Statement

Section 1125(a)(1) defines "adequate information" as:

"information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."

11 U.S.C. § 1125(a)(1).

A disclosure statement is the predicate for solicitation of votes on a Chapter 11 plan.  Section 1125(b) provides, in relevant part, that "[a]n acceptance or rejection of a plan may not be solicited . . . unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved . . . by the court as containing adequate information."  11 U.S.C. § 1125(b).  In considering approval of the disclosure statement, the Court may consider whether the plan described by the disclosure statement lacks a reasonable possibility of confirmation within a reasonable time.

### c.  Feasibility and Reasonable Possibility of Confirmation

The feasibility requirement is found in § 1129(a)(11).  That section provides that the Court shall confirm a plan only if:

"[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

11 U.S.C. § 1129(a)(11).

The Tenth Circuit has described the feasibility requirement as follows:

> The purpose [of the feasibility requirement] is to prevent confirmation of visionary schemes which [promise] creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation . . . . In

12

> determining whether [a plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.

*In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985) (quoting *Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985), and *Prudential Ins. Co. of Am. v. Monnier (In re Monnier)*, 755 F.2d 1336, 1341 (8th Cir. 1985)).

Although feasibility does not require a guarantee of success, the proposed plan must offer a reasonable assurance of success. *In re Saratoga & North Creek Railway, LLC*, 635 B.R. 581 (Bankr. D. Colo. 2022).

The Tenth Circuit BAP has further explained:

> When determining whether a plan is feasible, courts often consider a debtor's cash flow projections showing its ability to simultaneously make plan payments and fund projected operations. The projections must be based upon evidence of financial progress and must not be speculative, conjectural, or unrealistic. While courts often do not require projections for the same period over which a long-term plan spans, a debtor must still sustain its burden to somehow prove that it will be able to perform all obligations it is assuming under the plan.

*F.H. Partners, L.P. v. Inv. Co. of the Southwest, Inc. (In re Inv. Co. of the Sw., Inc.)*, 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006).

Where performance depends on a sale or refinancing, the Court must examine whether objective evidence provides reasonable assurance that the contemplated transaction will occur on terms and within a time sufficient to perform the plan. *See In re TMA Associates, Ltd.*, 160 B.R. 172, 177-78 (D. Colo. 1993) (affirming a feasibility finding where valuation evidence supported payment of the secured creditor through projected sales); *In re Investors Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994) (explaining that plans relying substantially on the sale or refinancing of a debtor's principal asset warrant close scrutiny of their underlying assumptions). A plan is not feasible when it merely postpones a secured creditor's remedies while the debtor speculates that the real estate market will improve sufficiently to fund repayment. *In re M & S Associates, Ltd.*, 138 B.R. 845, 851-52 (Bankr. W.D. Tex. 1992); *see also In re Hurricane Memphis, LLC*, 405 B.R. 616, 624-26 (Bankr. W.D. Tenn. 2009) (rejecting a plan dependent on speculative projections and uncommitted funding).

### d. Relief from Stay

11 U.S.C. § 362(d)(3) governs relief from stay in single asset real estate cases. It provides, in relevant part:

"On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section . . .

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief . . . or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments that—

(i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate . . . ; and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate . . . ."

11 U.S.C. § 362(d)(3).

Accordingly, a single asset real estate debtor may avoid stay relief under § 362(d)(3) by satisfying either prong of the statute. *In re Aspen Club & Spa, LLC*, No. BAP CO-19-043, 2020 WL 4251761, at *6 (B.A.P. 10th Cir. July 24, 2020).

The Debtor did not commence monthly payments to Indicate under § 362(d)(3)(B). The Court therefore considers whether the Debtor satisfied § 362(d)(3)(A). As the party opposing relief from stay, the Debtor bears the burden of proving that it filed a plan with a reasonable possibility of being confirmed within a reasonable time. *Id.*

The phrase "reasonable possibility" in § 362(d)(3)(A) is consistent with the Supreme Court's discussion of an effective reorganization under § 362(d)(2)(B). It is not enough to show "that if there is conceivably to be an effective reorganization, this property will be needed for it." *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 375 (1988). Rather, "[w]hat this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect." *Id.* at 375–76. "This means . . . that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *Id.* at 376.

11 U.S.C. § 362(d)(3)(A) does not require the Court to conduct a full confirmation hearing. The inquiry is whether the Debtor is proceeding toward reorganization, whether the proposed Plan has a realistic chance of confirmation, and whether the Plan is not patently unconfirmable. *In re Windwood Heights, Inc.*, 385 B.R. 832, 838 (Bankr. N.D. W. Va. 2008) (quoting *In re National/Northway Ltd. Partnership*, 279 B.R. 17, 24 (Bankr. D. Mass. 2002)).

14

V.    ANALYSIS

a. September 2025 Payoff Communications

The September 2025 communications do not establish that Indicate became unconditionally obligated to accept $8.7 million in full satisfaction of its claim. The proposed discounted payoff was tied to recurring $25,000 payments, completion of refinancing, and the grant of a second-position deed of trust. The Debtor made only one interim payment and did not complete the remaining performance. Even assuming the communications formed an agreement, the Debtor's material and unexcused nonperformance relieved Indicate of any corresponding duty to accept the discounted payoff. *See Converse*, 635 P.2d at 887. The Court therefore adheres to its limited finding that the communications do not establish an enforceable $8.7 million payoff for purposes of the stay-relief analysis, without determining the final allowed amount of Indicate's claim.

b. Reasonable Possibility of Confirmation

The Court considers the Plan's proposed funding and treatment of secured claims solely to determine whether the Debtor satisfied § 362(d)(3)(A). The Court does not determine whether the Disclosure Statement contains adequate information regarding the proposed funding under § 1125.

The Plan requires payment of Indicate's secured claim within eighteen months after the Effective Date (Doc. 132). The Plan also proposes treatment for Re III and other secured creditors (*Id.*). The Debtor's projected rental income is insufficient to perform that treatment. At full occupancy, the Debtor projects monthly net income of $27,647.48 (Doc. 144; Ex. J). That amount is insufficient to pay current interest on Indicate's secured claim, amortize principal, or make meaningful payments on junior secured debt.

The Debtor's MORs and profit-and-loss evidence exposes the problem. While they do show improvement in postpetition operations, they also show that the Debtor's reported operating results exclude interest payments to Indicate and do not reflect payments sufficient to reduce the secured debt. The MORs support a finding that the Debtor has stabilized leasing to some degree. They do not support a finding that the Debtor can fund the Plan from operations (Docs. 131, 149, 150; Ex. 11).

The Plan depends on refinancing and future sales. The refinancing evidence does not provide reasonable assurance that refinancing will occur. The record does not contain a binding refinancing commitment, an executed refinancing agreement, or the terms, amount, timing, or likelihood of financing sufficient to satisfy Indicate within the Plan period. The hearing testimony showed that prepetition refinancing efforts were extensive but unsuccessful. The Debtor did not present objective evidence that refinancing is now available on terms sufficient to perform the Plan.

The sale evidence also is insufficient. The Debtor intends to resume sales after leases begin to expire. The Debtor presented appraisals supporting value (Ex. F). But value alone does not establish feasibility. The appraisals do not establish binding sale contracts, committed purchasers, a sale schedule, or a sale process sufficient to perform

15

the Plan.  The evidence of prior unsuccessful listings for similar units further undermines the Debtor's ability to show that sales will occur quickly enough and at sufficient prices to satisfy the Plan's obligations (Exs. 20, 21, 22).

The Court assumes for purposes of this ruling that the appraisals support substantial value in the Property.  The Court need not determine the precise value of the Property or whether the Debtor has equity.  Even assuming substantial value, after close scrutiny, the Debtor did not prove a realistic means to monetize that value within the Plan period.

The Court recognizes that the Debtor has made progress in leasing units and preserving the Property.  The Court also recognizes that Mr. Adams is experienced in real estate development and intends to pay creditors in full.  Those facts do not establish feasibility.  A completed project with appraised value may still fall short of a confirmable plan if the debtor cannot show a realistic means to pay secured creditors as proposed.

Considering the evidence as a whole, the Court cannot find that the Plan offers a reasonable prospect of success or is workable.  The Plan's performance depends on future refinancing and sales that  remain too uncertain on the present record.  The Debtor therefore has not shown that the Plan has a reasonable possibility of being confirmed within a reasonable time.

### c.  Relief From Stay

The same finding requires relief from stay under 11 U.S.C. § 362(d)(3).

The Debtor argued in its written objection that Indicate did not properly serve the Motion on the Debtor's twenty largest unsecured creditors (Doc. 117).  The Court overrules the service objection.  The Motion proceeded to an evidentiary hearing after notice, the Debtor appeared and fully litigated the merits, and the Debtor did not identify any prejudice affecting its ability to respond to the requested stay relief.  The Debtor also did not identify any creditor whose absence from the hearing would affect the Court's analysis under 11 U.S.C. § 362(d)(3).  On this record, any service deficiency does not preclude adjudication of the Motion.

The Debtor is a single asset real estate debtor (Doc. 01).  The Debtor timely filed its initial Plan on December 12, 2025 (Doc. 87) and later filed the Amended Plan now at issue (Doc. 132).  Because the Debtor did not commence the monthly payments required by 11 U.S.C. § 362(d)(3)(B), however, its opposition depends on  § 362(d)(3)(A).  Timely filing alone does not satisfy that provision; the filed plan must have a reasonable possibility of being confirmed within a reasonable time.  For the reasons stated above, Debtor has not met that burden.

The Plan cannot be performed from projected rental income.  The Debtor's MORs and operating evidence confirm that the Debtor's operating income does not include debt service to Indicate and is not sufficient to satisfy Indicate's secured claim.  The refinancing has not occurred.  The sale evidence does not establish a reasonable assurance of sales sufficient to satisfy the Plan's obligations within a reasonable time.  The Debtor therefore

has not satisfied 11 U.S.C. § 362(d)(3)(A).  As such, relief from stay is mandatory under 11 U.S.C. § 362(d)(3).

Because relief is warranted under 11 U.S.C. § 362(d)(3), the Court need not decide all issues raised under 11 U.S.C. § 362(d)(1) or (d)(2).  The Court also does not determine the final allowed amount of Indicate's claim or the priority, validity, or amount of any other creditor's claim except to the extent necessary to rule under 11 U.S.C. § 362(d)(3).

### d.  Effect on the Disclosure Statement and Plan

The Disclosure Statement and Plan depend on the Debtor's continued possession and control of the Property to collect rents, obtain refinancing, and sell the townhomes.  Because the Court grants Indicate relief from stay as to the Property, there is no present purpose in proceeding with solicitation under the existing Plan.  The Debtor's request for approval of the Disclosure Statement will therefore be denied as moot.

The Court does not deny Debtor's Amended Plan.  The Plan is not before the Court for confirmation, and a plan proponent may modify a plan before confirmation.  11 U.S.C. § 1127(a).  The Court makes no determination in this Order concerning any future amended plan or other course of administration in this chapter 11 case.

## VI.   CONCLUSION

For the reasons stated above, the Debtor has not shown that the Plan has a reasonable possibility of being confirmed within a reasonable time.  The Plan would require Indicate, whose loan matured in April 2024, to bear continued delay and the risk of speculative market improvement without committed refinancing, binding sales, or sufficient operating income.  Even if the sale process commences in January 2027, it will take time to sell all nineteen townhomes and Indicate's note will not be repaid until more than three years after the maturity date.  Because the Debtor did not make the monthly payments required by  § 362(d)(3)(B) and did not satisfy  § 362(d)(3)(A), Indicate is entitled to relief from the automatic stay.  The request to approve the Disclosure Statement is moot in light of that relief.  Accordingly,

IT IS ORDERED that approval of the Debtor's Disclosure Statement to Accompany Amended Plan of Reorganization filed March 11, 2026 (Doc. 134), as supplemented by the Corrected Supplement filed March 30, 2026 (Doc. 144), is hereby DENIED as moot.

IT IS FURTHER ORDERED Indicate's Objection to the Disclosure Statement (Doc. 143) is OVERRULED as moot.

IT IS FURTHER ORDERED that the Amended Motion for Relief From Stay filed by Indicate Capital REIT, LLC on January 23, 2026 (Doc. 107) is hereby GRANTED.  The fourteen day stay of this Order under Fed.R.Bankr.P. 4001(a)(4) is NOT WAIVED.

The Court makes no final determination in this Order regarding the allowed amount of Indicate's claim, the amount of any other creditor's claim, or lien priority except as necessary to grant relief from stay under 11 U.S.C. § 362(d)(3).

17

Indicate's pending Motion to Prohibit Use of Cash Collateral (Doc. 153), Debtor's pending Motion to Continue Use of Cash Collateral (Doc. 155), and the objections thereto (Docs. 157, 160) are DENIED as moot.

Dated this 17th day of July, 2026.

BY THE COURT:

_____

Joseph G. Rosania, Jr.
U.S. Bankruptcy Judge